ORIGINAL

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

JUL 2 5 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

United States of America

v.

Ryan Paul Ocon Mitchell,

Defendant

Case No. SA 19 - 5 8 4 M

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of July 10, 2019 in the county of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm. |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Lawrence Wozniak, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 25, 2019

_____
*Judge's signature*

City and state:   Santa Ana, California

Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

# **A F F I D A V I T**

I, Lawrence Wozniak, being duly sworn, do hereby state the following:

## I. **INTRODUCTION**

1.    I am a Special Agent ("SA") with the Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been a Special Agent for approximately fifteen (15) years.  Prior to working as a Special Agent with ATF, I was an Inspector with ATF for approximately three (3) years, and my duties included regularly inspecting Federal Firearms Licensees ("FFLs").

2.    As a Special Agent, I have received training in federal firearms laws and regulations at the ATF National Academy and Criminal Investigator Training Program.  I regularly refer to these laws and regulations during the course of my duties.  During my employment with ATF, I have participated in dozens of investigations involving individuals illegally possessing firearms, ammunition, and narcotics.  In addition, I have worked with many different agencies throughout Los Angeles and Orange Counties and have participated in many investigations involving individuals illegally possessing and/or dealing in firearms.  I am currently assigned to the ATF Santa Ana Field Office.

1

## II. **PURPOSE OF THE AFFIDAVIT**

3.     This affidavit is made in support of a criminal complaint and arrest warrant for Calvin Tran CHANPA, also known as "Duece" ("CHANPA"), for a violation of Title 18, United States Code, Section 922(a)(1)(A): Engaging in the Business of Dealing in Firearms without a License and a criminal complaint and arrest warrant for Ryan Paul Ocon MITCHELL ("MITCHELL"), for a violation of Title 18, United States Code, Section 922(g)(1): Felon in Possession of a Firearm.

4.     This affidavit is also made in support of search warrants for the following locations:

a)     the residence located at 3555 W. Greentree Circle, Unit B, Anaheim, CA 92804, SUBJECT PREMISES 1 described in Attachment A-1,

b)     the person of Calvin Tran CHANPA, SUBJECT PERSON 1 described in Attachment A-2,

c)     the person of Ryan Paul Ocon MITCHELL, SUBJECT PERSON 2 described in Attachment A-3, and

d)     a black Infiniti model G37 sedan bearing a California license plate of 7YAN752, SUBJECT VEHICLE 1, registered to Calvin Tran CHANPA, and described in Attachment A-4.

Attachments A-1-A-4 are incorporated by reference.   SUBJECT PREMISES 1, SUBJECT PERSONS 1-2, and SUBJECT VEHICLE 1 are collectively referred to as the SUBJECT PREMISES.

### III. **ITEMS TO BE SEIZED**

5.     Based on the investigation in this case, I
respectfully submit that there is probable cause to believe
that the items listed in Attachment B, which constitute
evidence, contraband, fruits, or instrumentalities of
violations of 21 U.S.C. §§ 846 and 841(a)(1) (narcotics
conspiracy and trafficking); 21 U.S.C. § 843(b) (unlawful
use of communication facilities); 18 U.S.C. § 922(g)
(unlawful possession of firearms); 18 U.S.C. § 924(c) (use
and possession of firearms during and in relation to
narcotics trafficking); 21 U.S.C. § 856(a)(1): (maintaining
drug-involved premises); 18 U.S.C. § 922(a)(1)(A):
(engaging in the business of dealing in firearms without a
license); 18 U.S.C. § 371 (conspiracy to commit a Title 18
offense); 26 U.S.C. § 5861(d) (possession of an
unregistered firearm); and 18 U.S.C. § 1956(h) (money
laundering conspiracy) (collectively, "SUBJECT OFFENSES"),
will be found at the SUBJECT PREMISES.

6.     This affidavit is intended to show there is
sufficient probable cause for the requested search warrants
and complaint complaints, and does not purport to set forth
all of my knowledge of or investigation into this matter.
The statements set forth in this affidavit are based upon
my background, training and experience, my review of
reports related to this case, my review of field notes
related to this case, my debriefings with undercover
agents, my conversations with other involved personnel, my

review of electronic surveillance, my own personal observations and other reliable sources of information relative to this investigation.

## IV. SUMMARY OF PROBABLE CAUSE

7.    During the course of an investigation involving dealing in firearms without a license, illegal firearms possession, and selling narcotics, an ATF Undercover Agent purchased firearms and suspected methamphetamine from CHANPA on three occasions.  On two occasions, CHANPA arranged for the sale of firearms and suspected methamphetamine to occur at MITCHELL's apartment (SUBJECT PREMISES 1).  When an ATF undercover agent asked MITCHELL about purchasing a particular handgun that was at SUBJECT PREMISES 1, MITCHELL stated that it was his personal firearm and not for sale.  MITCHELL has a 2018 felony conviction for Carrying a Concealed Firearm in a Vehicle, in violation of California Penal Code, Section 25400(a)(1).

## V.  STATEMENT OF PROBABLE CAUSE

CASE BACKGROUND

8.    In May 2019, I initiated an investigation into firearm and narcotics sales occurring at different locations throughout Orange County and parts of Los Angeles County.

9.    Based on my personal participation in the investigation, my review of recorded telephone calls, text messages, and video of the firearms transactions, law enforcement reports, and my conversations with an ATF undercover agent ("UC-1"), a Brea Police Department undercover officer ("UC-2"), and another Brea Police Department undercover officer ("UC-3"), I learned the following:

### Purchase of Two Firearms from FRANCO on May 23, 2019[1]

10.    Between May 15, 2019 and May 23, 2019, there were several phone calls and text messages between UC-1 and a person known as Freddy, later identified as Ferdinand FRANCO ("FRANCO").

11.    On May 15, 2019, UC-1 initiated contact with FRANCO with the following text message exchange that was preserved.

UC-1:      Hey Freddy dis Locs boy Ronnie

FRANCO:    Hey wats up

---

[1] On June 20, 2019, the Honorable Autumn Spaeth, United States Magistrate Judge, issued a criminal complaint and arrest warrant for FRANCO, for a violation of Title 18, United States Code, Section 922(a)(1)(A): Engaging in the Business of Dealing in Firearms without a License.  (Case number SA 19-482 M).  FRANCO is currently in state custody and has not appeared in federal court on this complaint. For reasons described below, CHANPA is believed to be a supplier of FRANCO for firearms.  Accordingly, buys from FRANCO are summarized in this affidavit as well.

UC-1:       Loc wuz tryna hook up wit dem things

for me. U think u cud get em?

At this point in the conversation, FRANCO sent the UC-1 a photograph of an AR-15 style rifle in a case and a text that stated, "I got this right now".

12.   On May 23, 2019, UC-1 received an incoming telephone call from FRANCO.  They discussed where the firearms transaction would occur.  FRANCO stated that his firearms supplier lives in Anaheim.

13.   On May 23, 2019, prior to the undercover operation, UC-1 was fitted with an electronic video recording device as well as a transmitting device. Surveillance was established during the undercover operation and UC-1 was followed to and from the meet location.  During this undercover operation, UC-1 purchased two firearms from FRANCO for $1,600 in the parking lot located at 6328 Westminster Blvd., Westminster, California. FRANCO was accompanied by a female.  FRANCO told UC-1 that his Mexican source of supply has Glock firearms available for approximately $700 each.  The two firearms purchased by UC-1 from FRANCO were:

a. Unknown manufacturer, unknown model, 5.56 x 45 caliber rifle, S/N: unknown (AR-15 style rifle); and

b. Taurus, model: PT738 TCP, .380 caliber pistol,

S/N: 55429C.

14.   UC-1 informed me that after the firearms purchase, UC-1 reviewed FRANCO's California Drivers License photograph and identified Freddy as FRANCO.

### Purchase of Three Firearms and Suspected Methamphetamine from FRANCO on June 6, 2019

15.   Prior to this undercover operation, UC-1 had contact with FRANCO about the purchase of firearms and methamphetamine.  Between May 24, 2019 and June 6, 2019, there were numerous phone calls, photos, and text messages sent between FRANCO and UC-1.  Additionally, FRANCO sent UC-1 a video recording of an AR-15 style rifle.

16. On June 6, 2019, prior to this undercover operation, UC-1 had contact with FRANCO about the purchase of these firearms and methamphetamine.  UC-1 was fitted with two electronic video recording devices as well as a transmitting device.  Surveillance was established during the undercover operation and UC-1 was followed to and from the meet location.  During this undercover operation, UC-1 purchased three firearms and approximately one-quarter pound of suspected methamphetamine from FRANCO for $1,800 in the parking lot of the MainPlace Mall located at 2800 N. Main Street, Santa Ana, California.  The three firearms purchased were:

a. Ruger, model: Standard, .22 caliber pistol, S/N: 11-31917.  A records checks revealed that this firearm is a stolen firearm and was reported stolen in 2017 to the Gooding County Sheriff's Office in Gooding, Idaho;

b. Stoeger Arms, model: Luger, .22 caliber pistol, S/N: 44588; and

c. Unknown Manufacturer, unknown model, .38 Long CTG Revolver, S/N: 9408.

17. On June 7, 2019, the suspected methamphetamine that was purchased on June 6, 2019 was sent to the Drug Enforcement Administration ("DEA") Laboratory for further testing and analysis.

### Purchase of Five Firearms and Methamphetamine from FRANCO on June 13, 2019

18.  On June 13, 2019, UC-1 purchased five firearms and approximately one-quarter pound of methamphetamine from FRANCO.  Prior to this undercover operation, UC-1 had contact with FRANCO about the purchase of these firearms and methamphetamine.  Between June 12, 2019 and June 13, 2019, FRANCO sent UC-1 photos of various firearms.  There was also text message communication between UC-1 and FRANCO.

19.  On June 13, 2019, prior to this undercover operation, UC-1 was fitted with two electronic video

recording devices as well as a transmitting device. Surveillance was established during the undercover operation and UC-1 was followed to and from the meet location.  During the undercover operation, UC-1 purchased five firearms and approximately one-quarter pound of suspected methamphetamine from FRANCO for $6,600 at the parking lot of the MainPlace Mall located at 2800 N. Main Street, Santa Ana, California.  The five firearms purchased were:

      a. Anderson Manufacturing, model: AM-15, multi caliber pistol, S/N: 18241920;

      b. Anderson Manufacturing, model: AM-15, multi caliber firearm, S/N: 16076523;

      c. Glock, model: 17, 9mm pistol, S/N: BBDM728;

      d. Glock, model: 43, 9mm pistol, S/N: BGCK778; and

      e. Glock, model: 43, 9mm pistol, S/N: BHYA901;

   20.  On June 14, 2019, the suspected methamphetamine (approximately 117 gross grams) that was purchased on June 13, 2019 was sent to the DEA Laboratory for further testing and analysis.  The lab determined that the suspected methamphetamine contained 110.6 grams of actual methamphetamine and was 100 percent pure with a margin of uncertainty plus or minus four percent.

Purchase of Six Firearms from FRANCO on June 17, 2019

21.   On June 17, 2019, UC-1 purchased six firearms from FRANCO.  Prior to this undercover operation, UC-1 had contact with FRANCO about the purchase of these firearms. Between June 13, 2019 and June 17, 2019, there was one phone call between UC-1 and FRANCO and text message communication.  FRANCO sent UC-1 several photos of various types of firearms.

22.   On June 17, 2019, prior to the undercover operation, UC-1 was fitted with two electronic video recording devices as well as a transmitting device. Surveillance was established during the undercover operation and UC-1 was followed to and from the meet location.  During the undercover operation, UC-1 purchased six firearms from FRANCO for $5,800 at the parking lot of the MainPlace Mall located at 2800 N. Main Street, Santa Ana, California.  The six firearms purchased were:

     a. Mossberg, model: 500A, 12 gauge short barrel shotgun, S/N: P158857 (overall length measured to be approximately 24");[2]

---

[2] Pursuant to 26 U.S.C. § 5841, certain types of firearms that are not in the possession of the United States must be registered in the National Firearms Registration and Transfer Record ("NFRTR") and a tax must be paid if the firearm is transferred to another individual.  These firearms are commonly referred to as NFA firearms.  A type

b. Sig-Sauer, model: Sig M400, 5.56 caliber rifle, S/N: 38B010405;

c. HS Products, model: XD45 Sub-Compact Model 2, .45 caliber pistol, S/N: GM480223;

d. Glock, model: 22, .40 caliber pistol, S/N: NHV061;

e. Taurus, model: The Judge, 45/410 caliber revolver, S/N: JS706411; and

f. Matrix Aerospace Corporation, model: M556-SC, 5.56 caliber firearm, S/N: SC556-04251.

23. On June 12, 2019, ATF Industry Operations Investigator James Palm conducted a records check of FRANCO in the ATF Federal Licensing System database. This records check indicated that FRANCO does not currently and has never had a Federal Firearms License.

<u>Purchase of One Firearm and Suspected Methamphetamine from CHANPA on July 5, 2019</u>

24. In early July 2019, UC-1 received information from a source that an individual known as "Duece" had "off-roster" firearms available for purchase. "Off-roster" refers to firearms that do not appear on California's list

---

of NFA firearm included in this provision is "a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length." 26 U.S.C. § 5845(a)(2). Possession of an unregistered firearm of this type is a criminal violation pursuant to 26 U.S.C. § 5861(d).

of approved firearms for sale to the general public.
California law allows only law enforcement to purchase
these firearms.

25.   On July 2, 2019, UC-1 sent "Duece" (later
identified as CHANPA) an outgoing text message and inquired
about whether certain off-roster Glock model firearms were
available.  Shortly thereafter, UC-1 received an incoming
text message from CHANPA that stated, "Yea".

26.   After exchanging several text messages about
firearms transactions, UC-1 made a recorded call to CHANPA.
During this call, UC-1 asked CHANPA if he knew "Freddy"
("FRANCO").  CHANPA affirmatively responded and told UC-1
that FRANCO was currently in jail.  UC-1 indicated to
CHANPA that he had obtained a lot of firearms and
methamphetamine from FRANCO.  CHANPA stated, "I know, he
was tellin me, I was giving him stuff, like he was telling
me about you, but I never met you."  Later in the
conversation when UC-1 explained to CHANPA that he lost
FRANCO as his connection, CHANPA responded, "Yeah, this is
more direct now, cuz . . . yeah, he'll get most of em from
me.  I'll try to test out one by . . . a little bit, work
with you then.  Once we go from there, yeah I can give you
a lot."  Based on this conversation and my training and
experience, I believe CHANPA may have been the source for

some of the firearms that FRANCO sold UC-1.  UC-1 and
CHANPA discussed meeting on July 5, 2019 for the purpose of
selling UC-1 firearms and one-quarter pound of
methamphetamine.

27.  Between July 3, 2019 and July 5, 2019, UC-1 and
CHANPA exchanged a series of text messages that ultimately
arranged for the purchase of one Glock, model 42, .380
caliber pistol and approximately one quarter pound of
methamphetamine from CHANPA on July 5, 2019 at The Palms
Gentlemens Club in Signal Hill, California.

28.  On July 5, 2019, prior to the undercover
operation, UC-1 was fitted with an electronic video
recording device as well as a transmitting device.
Surveillance was established during the undercover
operation and UC-1 and UC-2 were followed to and from the
meet location.

29.  On July 5, 2019, at approximately 1354 hours, the
UCs arrived at The Palms Gentlemens Club.  At approximately
1408 hours, the UCs observed CHANPA driving alone in a
black Infiniti model G37 sedan, bearing California license
plate 7YAN752 (SUBJECT VEHICLE 1).  After speaking on the
phone, the UCs and CHANPA met in the parking garage and the
UCs followed CHANPA to SUBJECT VEHICLE 1.  CHANPA entered
his vehicle through the driver side while UC-1 entered the

vehicle through the front passenger side and UC-2 entered
through the rear passenger side. Shortly thereafter,
CHANPA retrieved from the driver side area a clear plastic
bag containing what appeared to be one-quarter pound of
suspected methamphetamine. CHANPA handed the suspected
methamphetamine to UC-1 and stated, "That's the QP right
there." Immediately afterwards, CHANPA retrieved a
firearm, later identified to be a Glock, model 42, .380
caliber pistol bearing serial number ABHB670 with the slide
bearing serial number ACXM467, also from the driver side
area and handed it to UC-1. CHANPA stated, "Here's that
three eighty you gotta wipe it down."

30.  UC-1 and CHANPA discussed potential future
firearms deals. UC-1 counted out and gave CHANPA $1500 for
the firearm and $900 for the suspected methamphetamine.

31.  At the conclusion of this undercover operation,
UC-2 provided me with the license plate (7YAN752) of the
black Infiniti sedan that CHANPA arrived in and the vehicle
in which the July 5, 2019 transaction occurred (SUBJECT
VEHICLE 1). I requested a records check for license plate
(7YAN752). This vehicle is registered to CHANPA at an
address in Long Beach.

32.  On July 9, 2019, UC-1 conducted a record check
for a California Driver's License photograph of CHANPA.

Upon obtaining and reviewing CHANPA's California Department
of Motor Vehicles ("DMV") photograph, UC-1 positively
identified the individual in CHANPA's DMV photograph as the
same person UC-1 and UC-2 met with during the July 5, 2019
firearm and methamphetamine transaction.

33. On July 9, 2019, the suspected methamphetamine
(approximately 112 gross grams) that was purchased on July
5, 2019 was sent to the DEA Laboratory for further testing
and analysis.

### Purchase of Three Firearms from CHANPA and MITCHELL on July 8, 2019

34. On July 8, 2019, ATF Agents conducted an
undercover operation resulting in the purchase of three
firearms from MITCHELL and CHANPA at SUBJECT PREMISES 1.

35. I met with UC-1 at a predetermined briefing
location. UC-1 stated that he had been communicating with
CHANPA who stated that he had firearms for sale to UC-1.
CHANPA offered to sell three firearms to UC-1 at SUBJECT
PREMISES 1 for $4,050. CHANPA told UC-1 to come to SUBJECT
PREMISES 1 to complete the firearms transaction as this was
his (CHANPA's) "homie's" residence and that he would pay
$50 to the "homie."

36. At the predetermined briefing location, UC-1 was
provided government funds, an electronic

transmitting/monitoring device and an electronic recording device.

37.   During this transaction, ATF Special Agents kept UC-1 under surveillance as he drove to SUBJECT PREMISES 1.  UC-1 initially waited in the parking lot of SUBJECT PREMISES 1 for CHANPA to arrive.

38.   UC-1 briefly drove away from the parking lot of SUBJECT PREMISES 1.  UC-1 then drove back to the parking lot of SUBJECT PREMISES 1 as CHANPA contacted UC-1 and stated that he (CHANPA) would arrive shortly.  When UC-1 returned, he went to SUBJECT PREMISES 1 and met with CHANPA and an adult male who identified himself as Ryan, and was later identified as MITCHELL.

39.   A records checks revealed that MITCHELL is a convicted felon.  On March 21, 2018, MITCHELL was convicted for a felony violation of California Penal Code Section 25400(A)(1): Carry a Concealed Weapon in a Vehicle (Felony)- Los Angeles Superior Court, Case# NA10858601. The charging document states, "First Amended Felony Complaint."  MITCHELL was sentenced to three years formal probation with credit for four days served.  In addition, MITCHELL was ordered not to own, use or possess any dangerous or deadly weapons, including any firearms, knives of other concealable weapons.

40.   UC-1 conducted the firearms transaction with
CHANPA and MITCHELL present within SUBJECT PREMISES 1.
CHANPA sold UC-1 the following firearms

a.   a Glock, model: 22, .40 caliber pistol, S/N:
TUP910;

b.   a Glock, model: 42, .380 caliber pistol, S/N:
ACNB004; and

c.   an Anderson Manufacturing, model: AM-15, multi
caliber pistol, S/N: 19149474.

41.   UC-1 then entered his vehicle and drove away from
SUBJECT PREMISES 1.  At the conclusion of this undercover
operation, UC-1 reviewed the California Driver's License
photo of MITCHELL and positively identified him (MITCHELL)
as the individual he met with CHANPA at SUBJECT PREMISES 1.

42.   On July 8, 2019, I obtained the DMV photo and
information for MITCHELL.  On MITCHELL's DMV information,
he has the listed address of SUBJECT PREMISES 1.

43.   On July 9, 2019, while conducting records checks
of MITCHELL, I observed within the California Law
Enforcement Telecommunications System ("CLETS") criminal
history report, that MITCHELL's arrest on February 23, 2018
has MITCHELL associated with the address of "3555,
GreenThree Cir AptB, W, Anaheim, CA, 92804."  This address

appears to a typographical error for the address of SUBJECT PREMISES 1.

44.   On July 24, 2019, I conducted a records search of MITCHELL within a law enforcement database and observed that MITCHELL has been associated with SUBJECT PREMISES 1 from August 2017 until June 2019.

45.   On July 24, 2019, UC-1 communicated with CHANPA who confirmed that MITCHELL still resides at SUBJECT PREMISES 1.

### Purchase of Three Firearms and Suspected Methamphetamine on July 10, 2019

45.   On July 10, 2019, ATF Agents and members of the Brea Police Department conducted an undercover operation resulting in the purchase of three firearms and approximately six ounces of suspected methamphetamine from CHANPA and MITCHELL at SUBJECT PREMISES 1.

46.   I met with UC-1 and UC-3 at a predetermined briefing location.   UC-1 stated that he had been communicating with CHANPA who stated that he had firearms and methamphetamine for sale.   CHANPA offered to sell three firearms and approximately six ounces of methamphetamine to UC-1 at SUBJECT PREMISES 1 for $6,450.   CHANPA told UC-1 to come to SUBJECT PREMISES 1 to complete the firearms and narcotics transaction.

47.   At the predetermined briefing location, UC-1 was equipped with government funds, an electronic transmitting/monitoring device and an electronic recording device.

48.   The UCs went to SUBJECT PREMISES 1 and met with CHANPA and MITCHELL.  The UCs conducted the firearms and narcotics transaction with CHANPA and MITCHELL within SUBJECT PREMISES 1.  CHANPA sold the UCs the following firearms:

a.   a Romarm/Cugir, model: Mini Draco, 7.62 caliber pistol, S/N: PE-5116-2018 RO;

b.   a Russia, model: SKS-45, 7.62 caliber rifle, S/N: RH008351; and

c.   a FN Herstal, model: unknown, 16 gauge shotgun with a barrel length less than 18 inches, S/N: 62891.

49.   CHANPA also sold UC-1 approximately six ounces of suspected methamphetamine.

49.   During the transaction, UC-1 and UC-3 observed MITCHELL reveal what appeared to be a black Glock, model 42 pistol from within the covers of his bed near UC-1 and subsequently laid it down in front of UC-1.  UC-1 asked, "Oh, that's yours?"  MITCHELL responded, "Mm, yes."

50.   Shortly thereafter, UC-1 and UC-3 observed a clear high capacity magazine loaded with what appeared to

be 9mm caliber ammunition, inserted into the firearm and
extending outside of the grip.  UC-1 then commented on the
clear magazine being the same one in two photograph files
that he received from CHANPA via text message on July 3,
2019.  Afterwards, CHANPA advised UC-1 that MITCHELL's
firearm is a nine (I believe referring to a 9mm caliber)
and the firearm UC-1 previously purchased from CHANPA is a
three eighty (I believe referring to a .380 caliber).

51.  UC-1 then asked MITCHELL if he could "check out"
the firearm.  MITCHELL responded, "Yeah, go ahead."  UC-1
held the firearm and asked MITCHELL if the firearm was
loaded, during which time MITCHELL negatively responded.
UC-1 noticed that a loaded magazine was already inserted
into the firearm.  UC-1 commented on the firearm being nice
and indicated that it is small enough to conceal inside a
pocket.  UC-1 asked MITCHELL if he wanted to sell the
firearm to him.  MITCHELL responded, "Hell naw."

52.  CHANPA then advised that the firearm consisted of
an eighty percent (80%) frame, despite observations from
UC-1 and UC-3 that it appeared to be a real Glock model 42
pistol.[3]  UC-1 asked CHANPA if the firearm is (referring to

--------------------------------

[3] An eighty percent (80%) frame or eighty percenter refers to
a firearm receiver blank, "casting" or "machined body" in
which the fire-control cavity area is completely solid and
un-machined and has not reached the "stage of manufacture"

an eighty percent (80%) firearm). CHANPA stated, "Yeah, it
don't jam though, the shit cool, test-fired." While
continuing to physically and visually inspect the firearm,
MITCHELL stated, "This motherfucker fit in the hand."
CHANPA stated, "Hell yeah." UC-1 then asked what kind of
ammunition was in the magazine. CHANPA stated, "It's a
nine (I believe referring to 9mm caliber)." MITCHELL
asked, "It's uh . . . what kind of bullets in there?"
CHANPA stated, "Nine RPs (I believe referring to Remington-
Peters) . . . regular bullets."

53.  Afterwards, UC-1 indicated to MITCHELL that he
had to keep the firearm to protect himself, during which
time MITCHELL stated, "Oh hell yeah, I take that anywhere,
everywhere." Shortly thereafter, UC-1 placed the firearm
back on MITCHELL's bed. UC-1 then proceeded to initiate
payment for the other firearms and suspected
methamphetamine to CHANPA.

54.  On July 12, 2019, I submitted the suspected
methamphetamine to the DEA Laboratory for testing and
analysis.

---

which would result in the classification of a firearm under
federal law. I know based on my training and experience
that sometimes people will still refer to a completed
firearm that was manufactured using an eighty percent frame
as an eighty percenter.

55.   On July 11, 2019, I conducted a records check of CHANPA in the ATF Federal Licensing System database.  This records check indicated that CHANPA does not currently and has never had a Federal Firearms License.

56.   On July 12, 2019, ATF Industry Operations Investigator ("IOI") J. Palm conducted a records check of CHANPA in the ATF National Firearms Registration and Transfer Record ("NFRTR") database.  This records check indicated that CHANPA does not have any National Firearms Act ("NFA") weapons registered to him in the NFRTR.

57. On July 12, 2019, IOI Palm conducted a records check of the FN Herstal, model: Unknown, 16 gauge shotgun with barrel length less than 18 inches, S/N: 62891.  This records check revealed that this firearm is not registered in the NFRTR.

58.   On July 24, 2019, I spoke with ATF Special Agent and Interstate Nexus Expert Ludger Parent who informed me that no firearms or firearms parts manufactured by Glock are made in the state of California.

Additional Evidence that CHANPA was a Supplier for FRANCO

59.   On July 17, 2019, I reviewed information from T-Mobile for subscriber and call detail records for FRANCO's phone number of (562) 986-8401.  While examining the call detail records of this phone number, I observed

that this phone number had contact with CHANPA's phone number of (562) 486-1719 on approximately 163 instances between May 1, 2019 and June 25, 2019.  UC-1 had communication with both FRANCO's phone number of (562) 986-8401 and CHANPA's phone number of (562) 486-1719 during this investigation.

## VI.  <u>TRAINING AND EXPEREINCE REGARDING DRUG AND FIREARMS TRAFFICKERS</u>

60.  As set forth in detail above, I have had experience, training, and communications with law enforcement personnel who specialize in the area of documentation and detection of proceeds from drug and firearms trafficking.  I also have experience in debriefing informants as witnesses who have personal knowledge of drug and firearms trafficking organizations.  Such individuals often have knowledge regarding the methods of transportation and distribution of the drugs, firearms, and money in large-scale distribution operations.

61.  Based on my training experience and speaking to other agents and law enforcement personnel who are experts in the area, I also know the following:

a.   Drug and firearms traffickers use various locations to serve different functions so that customers, thieves, and law enforcement personnel do not learn about any one location where large quantities of narcotics, firearms, money, and/or other criminal proceeds are stored.

Therefore, one or more locations are often used to store lesser amounts of narcotics, firearms, money, and/or other criminal proceeds, and additional locations are used to meet customers;

b.    Persons involved in large-scale drug and firearms trafficking conceal, in various locations, caches of drugs, drug paraphernalia, firearms, jewelry, automobiles, automobile titles, deeds to property, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in narcotics and firearms trafficking activities;

c.    Drug and firearms traffickers maintain at their locations, including the residences where they live, and in their vehicles, money, ledgers, narcotic and firearms supplier lists, correspondence, notations, logs, receipts, journals, books, records and other materials noting the price, quantity, or times when narcotics or firearms were obtained, transferred, sold, distributed, or concealed; that drug traffickers also maintain drug paraphernalia such as cutting materials, weighing devices, miscellaneous containers, and measuring devices which are used to facilitate the distribution of narcotics;

d.    Traffickers use telephones, portable cellular and digital telephones, and other communication devices sometimes in fictitious and/or other individuals'

names.  Traffickers commonly receive telephone calls and messages on telephone answering machines and phones from individuals seeking to conduct narcotics transactions.  As a result, traffickers often maintain in their residences, vehicles, and locations where they conduct transactions, records and items that reflect or contain names, addresses, and/or telephone numbers for their associates in the trafficking organization, or otherwise used as part of trafficking activity, even if said records may be in code. Such records and items include telephone address books and telephone listings, text messages, voice mails, answering machine recordings, as wells as letters, telephone bills, text messages photographs, e-mails, fax messages, and personal notes reflecting names, identities, addresses, and telephone numbers.

e.   When drug and firearms traffickers amass large quantities of cash from the sale of drugs and firearms, they often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, securities, travelers checks, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, and safety deposit boxes;

f.   Drug and firearms traffickers often place assets in names of relatives and close friends in order to avoid detection of those assets by law enforcement agencies; even though these assets are in other persons'

names, the dealers retain records, documents, and deeds
reflecting the purchase of those assets while continuing to
use those assets and exercise dominion and control over
them;

      g.   It is common practice for large-scale
narcotic and firearms traffickers to travel to their
purchase and distribution areas to facilitate their
trafficking; that after purchasing drugs or firearms,
traffickers will transport, or cause to be transported,
narcotics and firearms to areas in which they will
distribute the drugs and firearms; methods of
transportation include rental and private automobiles;

      h.   Drug and firearms traffickers take or cause
to be taken photographs of themselves, their associates,
their property and their product; traffickers usually
maintain these photographs at their premises;

      i.   That drug traffickers commonly have in their
possessions, that is on their persons, in their vehicles,
at their residence or at their stash houses, firearms,
including handguns, pistols, revolvers, rifles, shotguns,
machine guns and other weapons, that are used to protect
and secure the drug trafficker's property, including
narcotics, narcotic paraphernalia, currency, jewelry, and
records;

      j.   Drug and firearms traffickers often keep
records of their illegal activities for a period of time
extending beyond the time during which they actually

possess illegal controlled substances, to maintain contact with their criminal associates for future transactions, and to keep records of prior transactions for which, for example, a trafficker might still be owed money, or might owe someone else money.

62.   Based on the totality of circumstance, I believe that there is probable cause that the SUBJECT PREMISES contain controlled substances, firearms, and various items used to facilitate the possession for purposes of distribution and distribution of controlled substances and firearms.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

63.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used

for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    64.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring

to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

     65.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been

unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CHANPA's or MITCHELL's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of CHANPA's or MITCHELL's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    66.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

\\

\\

\\

\\

\\

\\

\\

\\

## VIII.    <u>CONCLUSION</u>

67.   I submit that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES. I also submit there is probable cause to issue a criminal complaint and arrest warrant for Calvin Tran CHANPA, also known as "Duece", for a violation of Title 18, United States Code, Section 922(a)(1)(A): Engaging in the Business of Dealing in Firearms without a License and a criminal complaint and arrest warrant for Ryan Paul Ocon MITCHELL, for a violation of Title 18, United States Code, Section 922(g)(1): Felon in Possession of a Firearm.

Lawrence Wozniak
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed and Sworn to before me
this __25th__ day of July, 2019.

UNITED STATES MAGISTRATE JUDGE
JOHN D. EARLY

32

## ATTACHMENT A-1

## PREMISES TO BE SEARCHED

The premises to be searched is described as follows:
The premises known as 3555 W. Greentree Circle, Unit B,
Anaheim, CA 92804 including all rooms, attics, assigned
garage or carport, and any vehicle in any assigned garage
or carport (attached or detached) (the "SUBJECT PREMISES
1"). SUBJECT PREMISES 1 is located on the west side of Knott
Avenue between the major cross streets of Ball Road to the
north and Cerritos Avenue to the south.  SUBJECT PREMISES 1
is located within the Evergreen Country Villas complex.
SUBJECT PREMISES 1 is further described as being on the
first level and located within a two story structure that
has multiple units contained within the structure.  The
front door to Unit B faces east within SUBJECT PREMISES 1.
The structure of SUBJECT PREMISES 1 has "3555 Greentree
Circle" written on the building facing west.  SUBJECT
PREMISES 1 is located on the west side of the complex to
the north of Stonepine Lane.  SUBJECT PREMISES 1 has a red
roof, and white garage doors facing west.  SUBJECT PREMISES
1 has Unit "B" on the door.

## ATTACHMENT A-2

### PERSON TO BE SEARCHED

SUBJECT PERSON 1 is Calvin Tran CHANPA depicted and described in the attached California Department of Motor Vehicles Image Record.  SUBJECT PERSON 1 includes any items on his person capable of containing items to be seized, including clothing pockets, containers such as a backpack or duffel bag, and any cellular phone on his person.

Page 1 of 1

Department of Motor Vehicles Image - CAL-PHOTO

## CALIFORNIA DEPARTMENT OF MOTOR VEHICLES
### IMAGE RECORD FOR:

## CHANPA CALVIN TRAN

| | | | |
|---|---|---|---|
| **F7165873** | **EXPIRES:** ▓▓▓ | **CLASS:** F | **SEX:** M |
| **HAIR:** BLK | **EYES:** BRN | **HEIGHT:** 503 | **WEIGHT:** 130 |
| **DATE OF BIRTH** ▓▓▓ | | | |
| **ADDRESS:** ▓▓▓ LONG BEACH, CA 90813 | | | |

| | | | |
|---|---|---|---|
| **PHOTO DATE:** 11/20/2015 | **PHOTO OFFICE:** 608 | **APPLICATION DATE:** 11/20/2015 | **APPLICATION OFFICE:** 608 |
| **ISSUE DATE:** N/A | **ISSUE OFFICE:** N/A | **RESTRICTIONS:** | |
| **PHOTO SEQ #:** 6351 | | **ENDORSEMENTS:** | |

SIGNATURE:




FINGERPRINT:



This photograph is a true copy of the photograph that is contained on the Department of Motor Vehicles photo database and delivered over the Department of Justice Cal-Photo communications network.

Date:_____ /s/_____

https://calphoto.svc.doj.ca.gov/CalPhoto/Search/SearchHome                          7/10/2019

35

## ATTACHMENT A-3

### PERSON TO BE SEARCHED

SUBJECT PERSON 2 is Ryan Paul Ocon MITCHELL depicted and described in the attached California Department of Motor Vehicles Image Record.  SUBJECT PERSON 2 includes any items on his person capable of containing items to be seized, including clothing pockets, containers such as a backpack or duffel bag, and any cellular phone on his person.

Page 1 of 1

Department of Motor Vehicles Image – CAL-PHOTO

## CALIFORNIA DEPARTMENT OF MOTOR VEHICLES
### IMAGE RECORD FOR:

## OCON MITCHELL RYAN PAUL

| | | | |
|---|---|---|---|
| F1086822 | EXPIRES: | CLASS: | SEX: M |
| HAIR: BLK | EYES: BLK | HEIGHT: 510 | WEIGHT: 171 |
| DATE OF BIRTH: | | | |

ADDRESS: 3335 W GREEN_TREE CIR UNIT B, ANAHEIM, CA 92804

| | | | |
|---|---|---|---|
| PHOTO DATE: 08/10/2018 | PHOTO OFFICE: 555 | APPLICATION DATE: 03/10/2018 | APPLICATION OFFICE: 519 |
| ISSUE DATE: N/A | ISSUE OFFICE: N/A | RESTRICTIONS: | |
| PHOTO ST.Q #: 3883 | | ENDORSEMENTS: | |

SIGNATURE:

FINGERPRINT:



This photograph is a true copy of the photograph that is contained on the Department of Motor Vehicles photo database and delivered over the Department of Justice Cal-Photo communications network.

Date:_____   N:_____

**ATTACHMENT A-4**

**VEHICLE TO BE SEARCHED**

A black Infiniti model G37 sedan bearing California license
plate of 7YAN752 ("SUBJECT VEHICLE 1").

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846 and 841(a)(1) (narcotics conspiracy and trafficking); 21 U.S.C. § 843(b) (unlawful use of communication facilities); 21 U.S.C. §§ 952, 960, and 963 (importation of, and conspiracy to import, controlled substances into the United States); 18 U.S.C. § 922(g) (unlawful possession of firearms); 18 U.S.C. § 924(c) (use and possession of firearms during and in relation to narcotics trafficking); 21 U.S.C. § 856(a)(1): (maintaining drug-involved premises); 18 U.S.C. § 922(a)(1)(A): (engaging in the business of dealing in firearms without a license); 18 U.S.C. § 371 (conspiracy to commit a Title 18 offense); 26 U.S.C. § 5861(d) (possession of an unregistered firearm); and 18 U.S.C. § 1956(h) (money laundering conspiracy) (the "Subject Offenses"), namely:

a.   Controlled substances, controlled substance derivatives, precursor chemicals, and other paraphernalia containing controlled substances;

b.   Controlled substance paraphernalia and equipment used for the distribution of controlled substances such as packaging materials and/or equipment, scales, labels, funnels, sifters, grinders, glass panes and mirrors, and razor blades;

c.    Material and equipment for drug and firearms trafficking proceeds including heat sealing devices, plastic packaging for cash, rubber bands, and money counting devices;

d.    Records, documents, programs, applications, or materials reflecting the names, addresses, telephone numbers, and other contact or identification data for individuals involved in the distribution of controlled substances or firearms;

e.    Records, documents, programs, applications, or materials reflecting additional storage locations for controlled substances or firearms;

f.    United States or foreign currency with a total value in excess of $500 USD;

g.    Records, documents, programs, applications, or materials receipts, notes, ledgers, tally sheets, and other papers relating to the production, transportation, ordering, purchasing, and/or distribution of controlled substances or reflecting the proceeds of those activities;

h.    Records, documents, programs, applications, or materials, invoices, receipts, records of real estate transactions, bank statements and related bank records, tax documents, passports, money drafts, money orders, bank drafts, wire transfers, cashier's checks, safe deposit box keys, and other materials which demonstrate the obtaining, secreting, transfer, and/or concealment of controlled

substances, paraphernalia, firearms or proceeds and any
assets derived from illicit proceeds;

    i.   Photographs, including still photos, negatives,
video tapes, films, undeveloped film, and the contents
therein, depicting controlled substances or firearms or any
entities or individuals involved in the production,
transportation, ordering, purchasing, possession and/or
distribution of controlled substances or firearms;

    j.   No more than 5 documents and records reflecting
the ownership, occupancy, possession, or control of the
Subject Location, including lease/rental agreements, rent
receipts, registration documents, bank records, utility
bills, telephone bills, other addressed envelopes, and
correspondence;

    k.   Records, documents, programs, applications, or
materials reflecting names, nicknames, addresses, and
telephone numbers of both current and past drug associates;

    l.   Safes, safety deposit boxes, keys for safety
deposit boxes, hidden compartments and other secure
locations, which often contain the proceeds of narcotics or
firearms trafficking activity, including large amounts of
United States currency, financial instruments, precious
metals, jewelry, and other items of value, as well as books
and records regarding the acquisition, use, and disposition
of such items of value;

    m.   Any firearm, as defined at 18 U.S.C. § 922(a)(3),
firearm parts, ammunition, firearm cases, receipts for

purchase, sale or transfer of firearms, and any tools or machines related to the manufacturing of firearms;

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii.  applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.     records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet

computers; personal digital assistants; wireless
communication devices, such as telephone paging devices,
beepers, mobile telephones, and smart phones; digital
cameras; gaming consoles (including Sony PlayStations and
Microsoft Xboxes); peripheral input/output devices, such as
keyboards, printers, scanners, plotters, monitors, and
drives intended for removable media; related communications
devices, such as modems, routers, cables, and connections;
storage media, such as hard disk drives, floppy disks,
memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS);
and security devices.

<strong>SEARCH PROCEDURE FOR DIGITAL DEVICES</strong>

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search
warrant will employ the following procedure:

a.   Law enforcement personnel or other
individuals assisting law enforcement personnel (the
"search team") will, in their discretion, either search the
digital device(s) on-site or seize and transport the
device(s) and/or forensic image(s) thereof to an
appropriate law enforcement laboratory or similar facility
to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to
exceed 120 days from the date of execution of the warrant.
The government will not search the digital device(s) and/or

forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

      b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court

and shall make and retain notes detailing how the
contraband or other evidence of a crime was encountered,
including how it was immediately apparent contraband or
evidence of a crime.

d.   If the search determines that a digital
device does not contain any data falling within the list of
items to be seized, the government will, as soon as is
practicable, return the device and delete or destroy all
forensic copies thereof.

e.   If the search determines that a digital
device does contain data falling within the list of items
to be seized, the government may make and retain copies of
such data, and may access such data at any time.

f.   If the search determines that a digital
device is (1) itself an item to be seized and/or (2)
contains data falling within the list of other items to be
seized, the government may retain the digital device and
any forensic copies of the digital device, but may not
access data falling outside the scope of the other items to
be seized (after the time for searching the device has
expired) absent further court order.

g.   The government may also retain a digital
device if the government, prior to the end of the search
period, obtains an order from the Court authorizing
retention of the device (or while an application for such
an order is pending), including in circumstances where the
government has not been able to fully search a device

because the device or files contained therein is/are encrypted.

       h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

      5.   This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

      6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

       a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress CHANPA's or MITCHELL's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of CHANPA's or MITCHELL's face with his or her eyes open to activate the

facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.